UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN D. GLEASON,

                Plaintiff,                    Nos. 17-12544 and 17-12816

v.                                    District Judge Robert H. Cleland
                                    Magistrate Judge R. Steven Whalen

WOODS CONDOMINIUM
ASSOCIATION,

                Defendant.

_____ /

## REPORT AND RECOMMENDATION

On August 2, 2017, Plaintiff John D. Gleason filed a *pro se* civil complaint alleging violations of the Fair Housing Act, 42 U.S.C. §§ 3601-3619, in Case No. 17-12544. On August 24, 2017, he filed a second complaint under the Fair Housing Act, in Case No. 17-12816. On December 11, 2017, the two cases were consolidated [Doc. #17], with Case No. 17-12544 being designated the lead case [Doc. #18].

Before the Court is Defendant Woods Condominium Association's Amended Motion for Summary Judgment [Doc. #37], which has been referred for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B). For the reasons discussed below, I recommend that the motion be GRANTED.

## I.    FACTS

Mr. Gleason suffers from a condition that makes him extremely sensitive to noise. This case arises out of his 14+ year dispute with the Woods Condominium Association, where he lives, regarding the noise created by the Association's landscaping service (Case No. 17-12544), and an alleged fly infestation (Case No. 17-12816).

## A. Noise

Plaintiff testified at a 2013 deposition in a Wayne County Circuit Court case that he has lived at the Woods Condominiums since 1987. *Plaintiff's Deposition*, Defendant's Motion [Doc. #37], Exhibit 1, at 6-7.  He graduated from dental school in 1979, and worked for a short time as a dentist, a musician, and a computer programmer before becoming disabled. *Id*. 11-15.  He began receiving Social Security Disability benefits in 1995.  *Id*. 15.  Plaintiff's medical conditions, including chronic fatigue syndrome, atrophic dystrophy, and joint problems, resulted in physical limitations in mobility.  He estimated that he was bedridden about 22 hours per day.  *Id*. 15-25.  Plaintiff testified that he also has extreme sensitivity to light and sound. He keeps the television on low volume and relies on subtitles. *Id*. 27-28.  He has noise-cancelling headphones in every room, and wears them even when he flushes the toilet or runs the dishwasher.  *Id*. 28.[1]

Plaintiff testified that he made his first complaint about noise from the landscaping equipment in April of 2004, but nothing changed.  He contacted Defendant again in 2005, at which time they made an agreement that the leaf blowers would be run a half-speed and not blown right up against the condo unit, and that the landscapers would use a small gas mower instead of a big riding mower.  *Id*. 34-35.  In 2009, because he believed the Defendant was not compliant with their agreement, he quit paying his assessment.  He hired a lawyer, and following negotiations they made some minor changes to the earlier agreement and waived the late fees on the assessment.  *Id*. 36-38.  However, Plaintiff was again not satisfied with the Defendant's compliance, and he then filed a complaint with the Michigan Department of Civil Rights ("MDCR").  This resulted in another agreement

---

[1] When Plaintiff told his doctor that he was bothered by loud noises, the doctor, who was apparently a Henny Youngman fan, told him,  "Well, don't listen to loud noises."  *Id*. 29.

in August of 2010.  *Id*. 39-40.

The 2010 MDCR settlement agreement is appended to Defendant's motion as Exhibit C.  After delineating areas of the Woods Condominium Association needing accommodations, the agreement includes the following provisions:

(a) "Every reasonable effort" will be made to complete the landscaping procedure within the defined area within one and one-half hours.

(b) The lawn immediately bordering Plaintiff's unit will be cut with either a manual reel mower (which Plaintiff provided) or an electric mower (which the landscaping company purchased).

(c) No power equipment, except the weed whip and electric mower, will be used in the "green" area on the map.  Within that area, any hedge or other trimming and yard clean-up will be done by manual means only.

(d) The sidewalk surrounding Plaintiff's unit will be swept clean by broom and/or electric mower.  No leaf blowers will be used, and during winter months when snow is present, no leaf blowers shall be used on the sidewalk immediately surrounding Plaintiff's unit.

(e) The area within 75 feet of Plaintiff's unit will be cut with a riding mower at ½ speed.  A leaf blower may be used along the west side of Building 11 so long as it is run at ½ speed.

(f) Leaf blowers on University Park Drive and the adjacent carport south of Plaintiff's unit will be run at ½ speed.

(g) The lawn/maintenance company will set the staging area for equipment at the west side of the open parking area south of Plaintiff's unit when staging there.  "If vehicles already parked there do not make that feasible, they shall stage in other parking

-3-

areas of the complex, never in the east half of the lot south of Gleason's condo."

(h) Plaintiff will pay $10 per week or $40 per month to Defendant for a period of seven months per year. Doc. #37, Pg. ID 496-97.

In 2013, Plaintiff sued Defendant in the Wayne County Circuit Court, alleging that Defendant had breached the 2010 settlement agreement. (The Plaintiff's Wayne County complaint is appended to Defendant's motion as Exhibit D). The parties resolved the dispute under the term set forth in a Settlement Memorandum dated January 5, 2017, and appended to Defendant's motion as Exhibit E , Doc. #37, Pg. ID 511-512. The settlement agreement, which superseded the 2010 agreement, provided as follows:

¶ 3. In the area defined as "Red" in the 2010 agreement, Defendant "shall ensure that the mowers be operated at as close to 50% speed as possible, consistent with the ability for the mowers to operate. In no event can the mower be operated at a speed in excess of 70%. There are to be no leaf blowers in the Red area except that a leaf blower may be used along the west side of Building 11."

¶ 4. Defendant will pay Plaintiff the sum of $4,400.00. "Defendant Woods shall install tachometers on the Grasshopper and Bobcat machines to monitor the speed. Plaintiff shall pay the cost for the tachometers prior to installation."

¶ 5. The previous $10 per week assessment is eliminated.

¶ 8. Plaintiff's arrearages for dues is eliminated.

¶ 9. "The obligations for the area described as "Green" including the sidewalks in Exhibit A in the prior agreement shall remain unchanged."

¶ 10. "Defendant Woods shall not stage their equipment immediately adjacent to Plaintiff's unit."

Pursuant to the settlement, the Wayne County Circuit Court Judge Patricia Fesard

-4-

entered a stipulated order of dismissal on January 22, 2015, dismissing the case with prejudice. *See* Defendant's Exhibit F, Doc. #37, Pg. ID 513-14,

Appended to Defendant's motion as Exhibit G is the affidavit of George Hensley, the owner of Dunn-Rite Land Services of Livonia. Doc. #37, Pg. ID 515-520. Mr. Hensley states that Dunn-Rite has performed landscaping at The Woods Condominiums since 1989, and for the past 10 or 15 years has done so "under strict guidelines in the field near John Gleason's condominium unit." *Hensley Affidavit*, ¶¶ 3-4. He states that "[o]ver the years, the landscaping guidelines have become more and more restrictive because, every time something is changed to appease Mr. Gleason, Mr. Gleason demands something more." *Id.* ¶ 7. Nevertheless, he states, "Dunn-Rite has done its best to abide by the guidelines provided by The Woods. Its employees are all aware that they cannot perform their job in a normal capacity near Mr. Gleason's condominium unit." *Id.* ¶ 8. He states that in the "red area" around Plaintiff's unit, they use only the electric mower, weed whipper, and hand tools, and in other nearby areas "we operate our equipment as close to 50% power as practical." He further states, "We do our best to operate the grasshopper at half power, but that is not always feasible. If conditions are wet, for example, we can't pick up leaves when operating the grasshopper at lower levels. We also know to keep the large powered equipment off the sidewalk, and we do our best to make sure that happens. Moreover, we don't park our trucks beside Mr. Gleason's unit. We park our trucks and trailers on the other side of the parking lot." *Id.* ¶ 9. Mr. Hensley states that he usually runs the 60" riding lawn mower, and does his best "to operate it at 50% speed and keep it in the area designated for its use. When outside of the restricted areas, I am able to run the equipment at full capacity." *Id.* ¶ 10.

Mr. Hensley states that "[f]ollowing the Association's guidelines is extremely

burdensome to Dunn-Rite.  The guidelines cause Dunn-Rite to spend additional time performing landscaping, and the guidelines affect the quality of Dunn-Rite's work." *Id.* ¶ 12.  He adds, "In order to comply with the landscaping restrictions, I estimate that Dunn-Rite spends at least an extra hour tending to the area near Mr. Gleason's condominium when compared to the amount of time it would take to do the same job with normal equipment and procedures.  It takes most of the day to do the whole condominium complex." *Id.* ¶ 13.

Mr. Hensley states that when weather conditions are good, Dunn-Rite is usually able to get the lawn cut and trimmed in Plaintiff's area within 1.5 hours. "However, in some circumstances, such as when the grass is wet because of rain or sprinklers and cannot be cut, Dunn-Rite performs the work that it is able to do near Mr. Gleason's unit and then completes the work at a later time when it is practical."  However, he says, "[i]t is not practical to require Dunn-Rite to complete all landscaping activities within a short, specified timeframe each week." *Id.*  ¶¶ 14-15.

Mr. Hensley states that it is impractical to use a manual reel lawn mower at the complex.  "In the past, Dunn-Rite attempted to use the reel mower over a 2-week period and found that it could not cut the grass and it took much more time to attempt cutting the grass.  The grass is too thick and the mower could not cut it.  Dunn-Rite will not use a manual reel mower again." *Id.* ¶ 16.  He states that he uses an electric lawn mower near Plaintiff's unit, and it is "no louder than a large fan." *Id.* ¶ 17.  He indicates that "Dunn-Rite also spends too much extra time using hand tools near Mr. Gleason's condominium, and their use doesn't perform the job as well as with power tools. In fact, the other co-owners that live near Mr. Gleason have complained that their area of The Woods doesn't look as good as other parts of the complex."  In addition, he says, "we have to spend extra

time manually sweeping and shoveling snow on the sidewalks because we are unable to use leaf blowers and machine snow blowers." *Id*. ¶ 18.  Mr. Hensley states that "Dunn-Rite spends an unreasonable amount of time abiding by the existing restrictions.  That extra time is money lost to Dunn-Rite.  It is not economically feasible for Dunn-Rite to accept additionally restrictive measures." *Id.* ¶ 20.  He opines, "I don't think that The Woods will find any landscaper that will be willing to operate under the restrictions that Mr. Gleason demands," *Id.* ¶ 22, and "[i]f additional restrictions are put into place that cause additional burdens on Dunn-Rite, I will have to reconsider working at The Woods or charging more for my services." *Id*. ¶ 21.

In his complaint [Doc.#1], Plaintiff alleges that from time to time, Defendant fails to perform or comply with the accommodations in the 2015 agreement, and fails to perform "newly requested (those made after the settlement agreement of Jan 5, 2015) reasonable accommodations...." *Complaint*, p. 8.  Plaintiff's new, post-agreement requests for accommodations included the following:

-That the maintenance around Plaintiff's unit be completed "as quickly and consecutively as possible."

-Keep the rider mower 20 inches back from the green area sidewalk.

-Not to use the electric mower just in the green area, and to test three other alternative mowers.

-Use a manual mower in the small green area east of his unit.  *Id*. p. 9.

In the "Relief" section of his complaint, the Plaintiff requests that the 2015 settlement agreement be modified to include the following new accommodations:

-Rider mower maximum speed be limited to 62%.

-Green area of Plaintiff's unit east of sidewalk be mowed not with the electric

mower, but with a manual mower.

-Staging area in parking lot to the South of Plaintiff's unit "will be restricted to west of the mid-lot sewer cover for all vehicles and equipment."

-"Staging will rotate among other available lots nearby."

-Plaintiff may request testing of any new equipment used, "for noise level and suitability."

-Grasshopper and suction machine never to be used in the red or green areas.

-Leaf blowers never to be used in the red or green areas.

In addition, Plaintiff seeks "a contractual monetary penalty, progressive in nature," if Defendant "has breached the agreement or has clearly failed to perform a requested reasonable accommodation."

### B.    Flies

Plaintiff alleges that in August of 2013, a fly infestation began in the condominium unit above his.  That unit was apparently occupied by a hoarder.  *Complaint*, Case No. 17-12816, Doc. #1, Pg. ID 8. That fly infestation "died out" in December 2013.  *Id*.  The infestation repeated itself in August, 2014. Exterminators were sent to Plaintiff's unit in September of that year, and entered the hoarder's unit in November. By that time, "the fly infestation had already diminished naturally."  *Id*.  Plaintiff alleges that beginning August 29, 2015, the flies returned.  Plaintiff was told that the hoarder had been talked to, and would remedy the problem herself.  *Id*. Pg. ID 9. On October 27, 2015, exterminators sprayed the upstairs unit.  However, in May 2016, "flies appeared in significant numbers." *Id*.  Plaintiff requested that the upstairs unit be sprayed, which was done three days after his request.  *Id*.  By October, the hoarder had vacated the unit, and a new owner moved in. Plaintiff alleges that there were still flies, although "their numbers were far less

than in 2015." *Id*. Pg. ID 10.   In terms of the current fly situation, Plaintiff states,

"Because so much work has been done to renovate 18427 UPD, the prior offending fly

source(s) may no longer exist." *Id*. Pg. ID 11.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary

judgment, the non-moving party must show sufficient evidence to create a genuine issue

of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).

Drawing all reasonable inferences in favor of the non-moving party, the Court must

determine "whether the evidence presents a sufficient disagreement to require submission

to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Entry of summary

judgment is appropriate "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial."  *Celetox Corp. v. Catrett*, 477 U.S. 317, 322

(1986).  When the "record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party," there is no genuine issue of material fact, and summary

judgment is appropriate.  *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the

record which demonstrate the absence of a genuine dispute over material facts, the

opposing party may not then "rely on the hope that the trier of fact will disbelieve the

movant's denial of a disputed fact," but must make an affirmative evidentiary showing to

defeat the motion.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

The non-moving party must identify specific facts in affidavits, depositions or other

factual material showing "evidence on which the jury could *reasonably* find for the

plaintiff."  *Anderson*, 477 U.S. at 252 (emphasis added).  If the non-moving party cannot

meet that burden, summary judgment is proper.  *Celotex Corp.*, 477 U.S. at 322-23.

### III.    DISCUSSION

### A.    Noise (No. 17-12544)

Here, the Defendant posits two bases for summary judgment: first, that Plaintiff's

request for addition accommodations greater than those imposed in the Wayne County

lawsuit is barred by *res judicata*; and second, that the accommodations he seeks are not

reasonable.

### 1.    Res Judicata

In *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 293 (2005),

the Supreme Court noted that the "Full Faith and Credit Act...requires the federal court to

give the same preclusive effect to a state-court judgment as another court of that State

would give.'" ( quoting *Parson Steel Inc. v. First Alabama Bank*, 474 U.S. 518, 523

(1986)).  Michigan has adopted a broad application of the doctrine of res judicata which

bars not only claims actually litigated in the prior action, but all claims arising out of the

same transaction that the parties, exercising reasonable diligence, could have raised in the

prior action but did not.  *Limbach v. Oakland County Bd of County Road Comm'r*, 226

Mich. App. 389, 396, 573 N.W.2d 336 (1997).

Application of the doctrine of res judicata in Michigan  requires that (1) the first

action be decided on its merits, (2) the matter being litigated in the second case was or

could have been resolved in the first case, and (3) both actions involved the same parties

or their privies.  *ABB Paint Finishing, Inc. v. National Union Fire Ins.*, 223 Mich. App. 559, 562, 567 N.W.2d 456 (1997) (1997).  "The test for determining whether two claims are identical for res judicata purposes is whether the same facts or evidence are essential to the maintenance of the two claims," *Huggett v. Dep't of Natural Resources*, 232 Mich. App. 188, 197, 590 N.W.2d 747 (1998), not whether the grounds asserted for relief are the same.  *Jones v. State Farm Ins. Co.*, 202 Mich. App. 393, 401, 509 N.W.2d 829 (1993), *mod'f on other grounds*, *Patterson v. Kleiman*, 447 Mich. 429, 433 n.3 (1994).

The prior action was the Wayne County Circuit Court lawsuit that was filed in 2013.  In that case, Plaintiff's claims included violation of Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1506a, retaliation, and breach of the 2010 MDCR settlement agreement.  That case was dismissed with prejudice.  In *Limbach v. Oakland County Bd of County Road Comm'r*, 226 Mich.App.  at 395, the Michigan Court of Appeals held that "[a] voluntary dismissal with prejudice is a final judgment on ther merits for res judicata purposes," and such "dismissal acts as res judicata with respect to all claims that could have been raised in the first action."  The Defendant has met the first prong of the test for application of *res judicata*.

As to the second prong, all claims in the first case were related to Plaintiff's challenge to noise produced by Defendant's landscaping activities and his request for accommodations, including limits to the type of machinery used, and the locations and length of time they could be used.  These are essentially the same claims he brings in the present case.[2]  The claims were resolved in the first case, and to the extent that Plaintiff

---

[2]  Claims under the FHA and Michigan's PWDCRA are subject to the same analytical framework.  "The statutory language contained in M.C.L. § 37.1506a(1)(a) and (b) of the PWDCRA parallels the language found in the FHAA, 42 U.S.C. 3604(f)(3)."  *Bachman v. Swan Harbor Ass'n*, 252 Mich. App. 400, 417, 653 N.W.2d 415 (2002).

seeks additional or different accommodations, those matters *could have been raised* in the first case.

Finally, the Wayne County case and this case involve the same parties.

"The doctrine of *res judicata* is intended to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and encourage reliance on adjudication, that is, to foster the finality of litigation." *Begin v. Mich. Bell Telephone Co.*, 284 Mich.App. 581, 598, 773 N.W.2d 271 (2009), *overruled on other grounds by Admire v. Auto-Owners Ins. Co*., 494 Mjch. 10, 831 N.W.2d 849 (2013). This complaint meets all three factors for applying *res judicata*. Therefore, the complaint should be dismissed with prejudice.

## 2. Reasonableness

The Fair Housing Act outlaws the "den[ial of] a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). *See also* 42 U.S.C. § 3604(b) (barring discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling ... because of race ... and handicap."). "Plaintiffs who allege a violation of 42 U.S.C. § 3604(f) may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodations." *Smith & Lee Assocs., Inc. v. City of Taylor, Mich*., 102 F.3d 781, 790 (6th Cir. 1996). The gravamen of Plaintiff's case is his allegation that Defendant has failed to make reasonable accommodations to address his hyper-sensitivity to noise, specifically to noise created by Defendant's landscaping service.

"Implicit nonetheless in the text of the FHAA is the understanding that while reasonable accommodations to achieve necessary ends are required, some accommodations may not be reasonable under the circumstances and some may not be

necessary to the laudable goal of inclusion. The requirement of reasonable accommodation does not entail an obligation to do everything humanly possible to accommodate a disabled person; cost (to the defendant) and benefit (to the plaintiff) merit consideration as well." *Bronk v. Ineichen*, 54 F.3d 425, 428–29 (7th Cir. 1995). *See also Smith & Lee Assocs.*, 102 F.3d at 795 (citing *Bronk*). *Smith* also noted the weight of authority indicating "that Congress intended courts to apply the line of decisions interpreting 'reasonable accommodations' in Section 504 [of the Rehabilitation Act] cases when applying the FHAA." *Id*. The Sixth Circuit stated that "[u]nder *Davis* [*Southeastern Community College v. Davis*, 442 U.S. 397 (1979)]*, an accommodation is reasonable unless it requires 'a fundamental alteration in the nature of a program' or imposes 'undue financial and administrative burdens.' 442 U.S. at 410." The Court must "balance the burdens imposed on the defendant by the contemplated accommodation against the benefits to the plaintiff." *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001) (citing *Smith & Lee Assocs.*, 102 F.3d at 795). A plaintiff must show that a requested accommodation  "imposes no 'fundamental alteration in the nature of the program' or 'undue financial and administrative burdens.' " *Howard v. City of Beavercreek*, 276 F.3d 802, 806 (6th Cir. 2002) (quoting *Smith & Lee Assocs.*, 102 F.3d at 794) .

The plaintiff in a FHA case " has the burden of proof to establish the reasonableness of a proposed accommodation." *Groner*, 250 F.3d at 1045. *Groner* held that as with claims under § 504 of the Rehabilitation Act, "'the disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable.") (emphasis in original). The employer then has the burden of persuasion on whether the proposed accommodation would impose an undue hardship.'"

(Quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183-84 (6th Cir.1996)).

Here, the Plaintiff has not shown that his highly detailed new accommodations are objectively reasonable, and concomitantly the Defendant has clearly shown that they would impose an undue hardship.  While the requested new restrictions *might* afford the Plaintiff some incremental benefit that the 2015 accommodations do not, they "require a fundamental alteration" in the nature of the previous agreement, and would impose "undue financial and administrative burdens" on the Defendant.  *Smith & Lee Assocs.*, 102 F.3d at 794.

In applying the burden/benefit balancing test of *Groner,* 250 F.3d at 1044, the burden to the Defendant clearly outweighs any marginal benefit to the Plaintiff.  Indeed, as shown by Mr. Hensley's affidavit, the Plaintiff's highly detailed requests create a triple burden.  First, apart from the fact that some of Plaintiff's requests–for example, that a manual lawn mower be used or that work be completed without interruption during wet conditions–are simply not feasible, the accommodations cost Dunn-Rite both time and money, creating a financial and administrative burden on the landscaping company. Secondly, the proposed accommodations would place a financial and administrative burden on the Defendant by not only requiring it to monitor–one might say micro-manage–the work of Dunn-Rite, but to either have to pay even more money for the landscaping service, or possibly lose the services of a company it has used for 20 years. And third, requiring the mandatory use of manual tools places a burden on Plaintiff's more immediate neighbors, who must contend with an inferior landscaping work product.

It could be argued that the accommodations imposed by the 2015 settlement are themselves objectively unreasonable.  Nonetheless, Defendant agreed to them, and notwithstanding Plaintiff's claim that Dunn-Rite from time to time fails to comply with

all of the requirements, it has been in substantial compliance with the agreement. By the same token, Plaintiff has been the beneficiary of significant adjustments in the way landscaping is done around his unit. Again, a reasonable accommodation does not require that the Defendant do everything humanly possible to address his complaints. *Groner*, 250 F.3d at 1047. What Plaintiff now requests is not reasonable, and no rational trier of fact could find otherwise. Summary judgment should therefore be granted.

### 3.   Retaliation

42 U.S.C. § 3617 proscribes retaliation for exercising a right under the Fair Housing Act:

> "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

"To state a claim under § 3617, the plaintiff in this case must establish (1) that he exercised or enjoyed a right guaranteed by §§ 3603–3606; (2) that the defendant's intentional conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection between his exercise or enjoyment of a right and the defendant's conduct." *Wells v. Rhodes*, 928 F. Supp. 2d 920, 931 (S.D. Ohio 2013), citing *Hood v. Midwest Sav. Bank*, 95 Fed.Appx. 768, 779 (6th Cir.2004). "Moreover, 'a plaintiff is required to demonstrate "discriminatory animus" to prevail on an interference claim under the Act.'" *Id.*, 928 F.Supp.2d at 931-32, quoting *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir.2012).

In his "Statement of Claims" in his complaint, Doc. #1, Pg. ID 8, Plaintiff asserts two instances of retaliation. First, at ¶ 3, he states that in June, 2015, Defendant demanded payment of $345.00 for an electric lawn mower that Defendant had purchased. Secondly,

-15-

at ¶ 4, he states that in December, 2015, Defendant unjustifiably billed him for $126.00, without providing a reason for that charge.

In total, Plaintiff asserted four claims; the first two centered on his requests for accommodations, and for those two he sets forth specific details. *Complaint*, Pg. ID 8-10. Significantly, he provides no details for his two retaliation claims.  That lack of detail, both on the face of the complaint and in the context of Defendant's summary judgment motion, is fatal.  In *Bell Atlantic Corp. v. Twombley*, 550 U.S 544 (2007), the Court, construing the requirements of Fed.R.Civ.P. 8(a)(2), held that although a complaint need not contain detailed factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level...on the assumption that all the allegations in the complaint are true." *Id.*, at 555 (internal citations and quotation marks omitted). Further, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (Internal citations and quotation marks omitted). *See also Association of Cleveland Fire Fighters v. City of Cleveland, Ohio* 502 F.3d 545, 548 (6th Cir. 2007). Stated differently, a complaint must "state a claim to relief that is plausible on its face." *Twombley*, at 570.  Then, in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court explained and expanded on what it termed the "two-pronged approach" of *Twombley*. First, it must be determined whether a complaint contains factual allegations, as opposed to legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, at 678, citing *Twombley*, 550 U.S. at 555.  Second, the facts that are pled must show a "plausible" claim for relief, which the Court described as follows:

> "Determining whether a complaint states a plausible claim for relief will, as
> the Court of Appeals observed, be a context-specific task that requires the

-16-

reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'shown[n]'–'that the pleader is entitled to relief.'" 556 U.S. at 679 (internal citations omitted).

Although the plausibility standard does not amount to a "probability requirement," it requires "more than a sheer possibility that a defendant has acted unlawfully." *Estate of Barney v. PNC Bank*, 714 F.3d 920, 924 (6th Cir. 2013)(internal quotation marks and citation omitted).

By failing to provide any detail regarding his retaliation claims, as he did in his claims of failure to accommodate, Plaintiff has done little more than offer "threadbare recitals" of his cause of action, "supported by mere conclusory statements."

More to the point, Plaintiff has provided no evidence from which a reasonable jury could conclude that by presenting him with these bills, the Defendant was acting with discriminatory animus, or that there was any causal connection with his exercise of any right protected by the FHA.  As Defendant points out, the 2015 settlement agreement in the Wayne County case established the accommodations to which Plaintiff was entitled under the FHA, and his request for additional or different accommodations to which he was *not* entitled cannot be considered protected activity.  He has not shown a causal connection between his request for accommodations and the Defendant's request for payments, nor has he shown evidence of discriminatory animus.

Moreover, he has not alleged or shown evidence that he actually paid the invoices; thus, he has not shown that he suffered any loss of property, a requirement of finding an adverse action under the FHA.  In *United States v. Trumbull Metro. Hous. Auth.*, 2017 WL 4882438, at *5 (N.D. Ohio 2017), the Court held as follows:

"Under the FHA, adverse action must result in some loss of property. *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002); *see Hollins v. Atl.*

*Co.*, 188 F.3d 652, 662 (6th Cir. 1999) (stating that an adverse action must result in a materially adverse change that is more disruptive than a mere inconvenience; a materially adverse change must result in a financial loss, a material loss of benefits, or other type of substantive loss)."

Summary judgment should therefore be granted on Plaintiff's retaliation claims.[3]

## B.   Flies (No. 17-12816)

The FHA provides that a person with disabilities is entitled to reasonable accommodations "when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The operative statutory language is "equal opportunity." In *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 541 (6th Cir. 2014), the Court explained that concept as follows:

> "'Equal opportunity'" means that disabled individuals are entitled to live in the same residences and communities as non-disabled individuals, insofar as that can be accomplished through a reasonable accommodation or modification. The statute then 'links the term "necessary" to the goal of equal opportunity.' Thus, an FHA reasonable-accommodation or reasonable-modification plaintiff must show that, but for the requested accommodation or modification, he 'likely will be denied an equal opportunity to enjoy the housing of [his] choice.' The necessity element is, in other words, a causation inquiry that examines whether the requested accommodation or modification would redress injuries that otherwise would prevent a disabled resident from receiving the same enjoyment from the property as a non-disabled person would receive." (Internal citations omitted).

In *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1226 (11th Cir. 2008), the Eleventh Circuit held that "'equal opportunity'" can only mean that handicapped people must be afforded the same (or 'equal') opportunity to use and enjoy a dwelling as non-handicapped people, *which occurs when accommodations address the needs created*

---

[3] Defendant also points out that any alleged retaliatory acts preceding August 24, 2015–such as the June, 2015 bill for the electric lawn mower–are barred by the FHA's two-year statute of limitations, 42 U.S.C. § 3613(a)(1)(A). (Plaintiff's complaint in this case was filed on August 24, 2017).

*by the handicaps*." (Emphasis added).  The Court went on to state, "If accommodations go beyond addressing these needs and start addressing problems not caused by a person's handicap, then the handicapped person would receive not an "equal," but rather a better opportunity to use and enjoy a dwelling, a preference that the plain language of this statute cannot support." (Citing *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 749 (7th Cir.2006) (en banc) ("[T]he statute requires only accommodations necessary to ameliorate the effect of the plaintiff's disability so that she may compete equally with the non-disabled in the housing market."); *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 460 (3d Cir.2002) ("[I]f the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be necessary.") (quotation marks omitted); *Bryant Woods Inn*, 124 F.3d at 604[4] ("The FHA does not require accommodations that increase a benefit to a handicapped person above that provided to a nonhandicapped person with respect to matters unrelated to the handicap."); *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 152 (2d Cir.1999) (explaining that the relevant inquiry is whether "the non-complying features of the proposed residence are 'necessary' in light of the disabilities of proposed residents")).

No one likes flies.  But what does the fly infestation have to do with Plaintiff's noise-related disability?  Presumably all residents were inconvenienced or annoyed by the flies, but the Plaintiff's proposed accommodations do not address the need related to his handicap.  *Schwartz* at 1226.  *See also McColm v. San Francisco Hous. Auth.*, 2009 WL 2901596, at *7 (N.D. Cal. 2009) (problems such as insects "are normal problems tenants have with landlords, not requests for accommodations for a disability").

---

[4] *Bryant Wood Inn, Inc. v. Howard County, Md.*, 124 F.3d 597 (4th Cir. 1997).

Plaintiff was not denied the "equal opportunity" to use and enjoy his dwelling, as compared to other residents.  His FHA claim based on the fly affair therefore fails.

In addition, I agree with Defendant that based on Plaintiff's statement that "the prior offending fly source(s) may no longer exist," his claim regarding the flies is moot. "To have standing to bring suit, a plaintiff must allege 'injury in fact' to his preexisting, legally protected interest. The injury must be '(a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical.'" *Granger v. Klein*, 197 F. Supp. 2d 851, 878 (E.D. Mich. 2002), quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)(internal quotation marks omitted).  Standing is related to the concept of mootness. Mootness is "'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).' " *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68, n.22 (1997)). "[A] federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).

There are no more flies.  The possibility that there may be flies in the future is hypothetical; it was hypothetical when Plaintiff filed his complaint, and it is hypothetical today.  Plaintiff's fly-related claims should be dismissed as moot.

## IV.   CONCLUSION

For all of these reasons, I recommend that Defendant's Amended Motion for Summary Judgment [Doc. #37] be GRANTED and that both Case No. 17-12544 and Case No. 17-12816 be DISMISSED WITH PREJUDICE.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1,"  "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than fourteen (14) days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: March 3, 2019

## CERTIFICATE OF SERVICE

I hereby certify on March 3, 2019 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to non-registered ECF participants on March 3, 2019.

s/Carolyn M. Ciesla
Case Manager for the
Honorable R. Steven Whalen